Froessel, J.
On the morning of September 30, 1958, three investigators attached to the New York Waterfront Commission, New York Harbor, and a detective from the Kings County District Attorney’s office were stationed upon a promenade overlooking Pier No. 2 at the Brooklyn waterfront. They observed the activities of defendant from 7:05 to 7:40 a.m. He was standing below them but about 100 feet distant, in front but somewhat to the side of Pier No. 2. On that pier was erected an enclosed structure, with an open ramp immediately alongside, jutting out into the water. The area where defendant was standing was used as a waterfront facility for loading and unloading merchandise. It was known as the “farm area”, and “considered part of the pier area ” as well as part of the Port of New York District (see Port of New York Authority Compact, art. II; L. 1921, ch. 154). A wire fence separated this farm area from the adjoining property directly in front of Pier No. 2. That area has since been built upon and fenced off.
During the period of observation, 12 men dressed in longshoremen’s attire approached defendant at separate intervals, had conversations 1 ‘ in close contact ’ ’ with him, and 9 of the 12 gave him money in the form of bills. Each of the 12, after completing his conversation or transaction with defendant, proceeded to enter upon the pier. It was observed that defendant made nota *65 tions on some of the bills given him, and, additionally, upon a slip of white paper.
After defendant was thus observed for over half an hour, two of the investigators and the detective entered their car and drove down to the pier level. One of them, Investigator Donato, there approached defendant and, upon interrogation, the latter stated that he was selling women’s shoes to friends for the Concord Shoe Company at $3.50 a pair. When asked by the investigator for specific names of the individual purchasers, defendant stated that “ he hadn’t started to sell any shoes as yet ”.
A search of defendant’s automobile following this conversation disclosed neither “shoes” nor other “merchandise”. Defendant’s person was also searched and $57 in bills of various denominations and $2.50 in coins were found. Four of the bills bore penciled figure notations. The white slip of paper, however, was not found.
Immediately after this episode at the waterfront, defendant was taken to the office of the Brooklyn District Attorney’s Racket Squad and was interrogated. When there asked if he had had any conversations with the owner of the shoe company for which he was allegedly selling shoes, defendant stated, “ Not yet”.
At the trial, the owner of the Concord Shoe Company, one Irving Shore, a brother-in-law of defendant, testified that the latter was not in his employ on September 30, 1958, nor prior thereto, and, further, that he had not seen nor had conversation with defendant since the preceding Christmas, about nine months before. Shore did state, however, that he had spoken with his sister-in-law prior to September 30, 1958, and told her to have defendant ‘ ‘ come up ’ ’ and he would ‘1 give him some accounts to go in with samples and he will sell”. The accounts which Shore had in mind were Brooklyn and Manhattan department stores; however, although he was a manufacturer and did not retail his merchandise, he had no objection if defendant were to sell to individuals on a retail basis.
Upon the foregoing record—based upon the testimony of two of the investigators present at the scene, and the witness Shore, the only witnesses at the trial—defendant was found guilty (with one dissenting vote) of violating section 7 of the Waterfront Commission Act (L. 1953, ch. 882, as amd. by L. 1957. ch. *66 188), which provides: “ No person shall, without a satisfactory explanation, loiter upon any vessel, dock, wharf, pier, bulkhead, terminal, warehouse, or other waterfront facility or within five hundred feet thereof in that portion of the Port of New York district within the state of New York.” Defendant was sentenced to 60 days in the workhouse.
Defendant on this appeal challenges the propriety of his conviction on three grounds: It is urged that the statute is unconstitutional; that the evidence was insufficient to prove guilt beyond a reasonable doubt; and that prejudicial error was committed at the trial in regard to the offer in evidence, without objection, of an order of the Waterfront Commission denying defendant’s application for registration as a longshoreman.
In this opinion we shall treat only with the constitutional question presented. Defendant’s other points, which we find lacking in merit, do not warrant discussion. With regard to the constitutional question, defendant maintains that the statute is vague, ambiguous, and lacking in definite standards. More particularly, defendant challenges the provisions of the statute confining the offense to those loitering ‘ ‘ without a satisfactory explanation ’ ’ and 1 ‘ within five hundred feet ” of a waterfront facility.
This court, when called upon in the past to resolve challenges of a similar constitutional nature, has consistently recognized that the term ‘ ‘ loiter ” or “ loitering ’ ’ is one of common and accepted meaning (People v. Bell, 306 N. Y. 110, 113, 116-117; People v. Diaz, 4 N Y 2d 469, 470; People v. Johnson, 6 N Y 2d 549, 552). Our cited decisions indicate, however, that notwithstanding the well-understood meaning — acquired through extended usage — of the term loiter or loitering, when taken 1 ‘ by itself, and without more ”, it is not “ enough to inform a citizen of its criminal implications and, by the same token, leave it open to arbitrary enforcement” (People v. Diaz, supra, at p. 470). The clarity and certainty necessary to satisfy constitutional requirements may be acquired, however, by reference to the context in which the term is used.
Thus, in the Diaz case (supra), a statute dealing with loitering, without more, on public streets at large was declared constitutionally void. The statute provided: “No person shall lounge or loiter about any street or street corner in the City of *67 Dunkirk.” The term loiter or loitering as “ use[d] ” in the statutory context failed ‘ ‘ to point up the prohibited act, either actual or threatened ”. In other words, distinction could not be drawn between “ conduct calculated to harm and that which is essentially innocent ” (4 N Y 2d, at p. 471).
In the Johnson case (supra), however, the statutorily proscribed loitering did not involve public streets but related instead to public school buildings and grounds. Such premises, we declared, were of a “ restricted public nature ’ ’; and the statute prohibiting loitering, when read 1 ‘ in the light of the nature of a school building”, satisfied constitutional requirements (6 N Y 2d, at p. 552).
Similarly, in People v. Bell (supra), where loitering at large on public streets was not at issue, but rather loitering “ about ” railroad or subway facilities, we upheld the constitutionality of the statute. In dealing with a specific facility such as a railroad or subway, the proscribed misconduct was readily ascertainable, and that essentially innocent was excludable from the statutory ambit. We reasoned that the apparent legislative purpose in enacting the statute was “ to prevent persons ” — in particular “ nondescript characters ” and “ degenerates ” — “ from infesting subway, elevated or other railway stations ”. Obviously, a 1 ‘ danger to the public ’ ’ inhered in their presence. The prohibition against “loitering” in that “context”, therefore, “ signif [ied] that persons should not linger about stations under circumstances which fall short of rendering them implied invitees or licensees of the railroad ” (306 N. Y., at pp. 113-114). The statute, and the term loitering in particular, were thus susceptible of definite and clear construction by reference to the statutory context and occasion.
In the case before us we are also dealing with specific facilities. The delineated area, the waterfront, serves the commercial needs of the shippers using its various facilities. Furthermore, it is a known fact that “ evil” conditions have pervaded the waterfront area of New York Harbor (Waterfront Commission Act, Part I, art. I [Findings and Declarations]; see generally Fourth Report of N. Y. State Crime Comm., N. Y. Legis. Doc., 1953, No. 70; Hearings Before Subcommittee No. 3 of the Committee on the Judiciary, H. R. 83d Cong., 1st Sess. [1953] ; Report of New Jersey Law Enforcement Council [1953]). *68 Prominent among these evils was criminal activity, such as loansharking, hook-making, policy and other rackets (see N. Y. Legis. Ann., 1957, pp. 317, 483). In view of these factors, namely, the specification of facilities, their known utility and purpose, and the notoriety of the evils which have pervaded the area, the particular misconduct at which the statute is directed becomes apparent. Loitering in the context here presented is lingering about waterfront facilities for a purpose unconnected with lawful waterfront business or related activity. Constitutional guarantees, therefore, are not offended by the statute. The term loitering, as has been demonstrated, is possessed of sufficient clarity and definition in context.
Defendant’s contention that the provision “ without a satisfactory explanation” in itself renders the statute vague and indefinite has already been answered completely by our decision in the Bell case (supra). There, in construing the virtually identical phrase contained in the railroad loitering statute, namely, ‘ ‘ who is unable to give satisfactory explanation of his presence ’ ’, we held that it served to restrict the scope of the statute to the advantage of the accused, and its effect was to impose but a procedural condition rather than add a substantive element to the offense (306 N. Y., at p. 115).
Defendant’s final constitutional point is that the provision 1 ‘ within five hundred feet thereof ” also renders the statute fatally “ confounded”. Defendant’s claim appears to be that measuring 500 feet from a “ vessel, dock, wharf, pier, bulkhead, terminal, warehouse, or other waterfront facility ’ ’ would lead one into the public streets and thoroughfares, and our holding in the Dias case (supra) would, therefore, void the statute.
The People argue that by the 500-foot provision the Legislature intended to regulate 11 a reasonably close area to the pier itself ”. In essence, the provision means “ nearby ” or “ in or about” as provided in other loitering statutes (Penal Law, § 722-b [loitering in school buildings; see People v. Johnson, supra]; see, also, Penal Law, § 150, subd. 2; § 1990-a, subd. 2 [railroad loitering; see People v. Bell, supra]; Penal Law, § 722, subd. 8).
We are now, however, called upon to decide only the constitutional impact upon the statute as applied to the facts of this case. ‘ ‘1 Constitutional questions are not to be decided hypo *69 thetically ’ ” (People v. Faxlanger, 1 N Y 2d 393, 395; see, also, People v. Terra, 303 N. Y. 332, 334; Waterfront Commission Act, § 11). Here, defendant loitered upon the farm area, within 100 feet of the pier structure itself, and in the Port of New York District. It was not on a public street. This farm area, as previously noted, was used for loading and unloading merchandise, and is now built upon. It, therefore, definitely qualified asa“ waterfront facility ’ ’, one of the expressly enumerated areas of regulation provided in the statute. Accordingly, defendant has no cause for complaint. The mere claim that 500 feet from this waterfront facility there may have been public streets is beside the point, and we may determine such issue when the case arises.
The judgment appealed from should be affirmed.
Chief Judge Desmond and Judges Dye, Fuld, Van Voobhis, Bubke and Fosteb concur.
Judgment affirmed.